James Edward HOEFLING, Jr., Plaintiff,

v.

CITY OF MIAMI, Ricardo Roque, and Jose Gonzalez, Defendants.

Case No. 11–22358–CIV.

United States District Court, S.D. Florida.

July 13, 2012.

James Edward Hoefling, Jr., Miami, FL, Pro Se.

Warren Bittner, Miami City Attorney's Office, Miami, FL, Ronald Jay Cohen, Ronald J. Cohen, P.A., Miami Lakes, FL, for Defendants.

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS (D.E. 37)

JOAN A. LENARD, District Judge.

**THIS CAUSE** is before the Court on Defendants City of Miami, Ricardo Roque, and Jose Gonzalez's Motion to Dismiss Amended Complaint and Motion to Strike Demand for Punitive Damages ("Motion," D.E. 37), filed on January 27, 2012. Plaintiff James Edward Hoefling, Jr. filed his Response to the Motion ("Response," D.E. 41) on February 17, 2012, to which Defendants filed their Reply on February 27, 2012 ("Reply," D.E. 42). Upon review of the Motion, Response, Reply, and the record, the Court finds as follows.

## I.  Background [1]

■ This is a case related to the destruction of a vessel called the "METIS 0." Plaintiff James Edward Hoefling, Jr. ("Hoefling") owned the "METIS 0," lived on the vessel, and stored all of his personal possessions on the vessel. Hoefling alleges that on August 20, 2010, two officers from the City of Miami Police Department's Marine Patrol Detail, Sergeant Jose Gonzalez ("Gonzalez"), and Officer Ricardo Roque ("Roque"), searched the "METIS 0" and subsequently ordered that the vessel be destroyed. Based on this order, the vessel and all of Hoefling's personal belongings, with the exception of a generator, were crushed and placed in a

---

1. The following facts are gleaned from Plaintiff's Amended Complaint (D.E. 33) and the exhibits attached to Plaintiff's Amended Complaint, and are deemed to be true for purposes of Defendants' Motion.

dumpster. Hoefling alleges that Gonzalez and Roque knew that Hoefling was the owner of the vessel, lived on the vessel, and that all of his possessions were on the vessel, and that their search and subsequent destruction of the vessel was "willful and intentional" and done "without legal authority." (*See* Am. Compl. ¶ 15.) Hoefling also alleges that the officers searched and destroyed his vessel without providing him any "warning or notice" (*see id.* ¶ 11); however, this assertion is contradicted by an exhibit attached to the original Complaint [2] (D.E. 1) and an exhibit attached to the Amended Complaint (D.E. 33).[3]

Plaintiff provided as an exhibit to his original Complaint a document entitled "City of Miami Office of Code Enforcement NOTICE," which was signed by Officer Alejandro Macias and dated May 27, 2010. (Compl., D.E. 1, Ex. 3 (Notice).) This Notice was attached to Plaintiff's vessel and informed Plaintiff that the vessel was unlawfully on the property. (*See id.*)

Plaintiff provided as an exhibit to his Amended Complaint three City of Miami Police Department Incident Reports, dated May 27, 2010, August 20, 2010, and September 20, 2010 (Exhibit 3). The narrative from the May 27, 2010 City of Miami Police Department Incident Report shows that Hoefling had notice of the derelict condition of the vessel and provides the following description of the events:

> Above listed sailboat with HIN No. FLZK9098D980 is derelict, in that it is left stored and abandoned in a substantially dismantled condition upon public state waters. Listed sailboat has no motor, sails, helm or rudder for propulsion or steering. On May 27, 2010 this officer contacted Mr. James Edward Hoefling Jr on the above listed boat about the condition of his vessel and advised him that it needs to be removed or brought into compliance with the law as per Florida State Statute 823.11.

> Vessel is located at coordinates N25 42.962' W080 13.188'

> *Note—Mr. Hoefling advised this officer that he is going to install an anchor light on the vessel and that he was going to comply with the law as soon as he is able.

(Am. Compl. Ex. 3 (May 27, 2010 Incident Report).)[45] The August 20, 2010 City of Miami Police Department Incident Report narrative, written by Officer Ricardo Roque, provides the following description of the events:

---

**2.** "In determining whether an amended complaint should be dismissed for failure to state a claim upon which relief can be granted, a court may rely on documents attached to the original complaint." *Jackson v. Cutchins*, 2011 WL 1124219, at *3 n. 2 (N.D.Fla. Feb. 11, 2011) (citing *Gross v. White*, 340 Fed. Appx. 527, 534 (11th Cir.2009) ("A district court ruling on a motion to dismiss is not required to disregard documents that the plaintiff himself filed with his original complaint."); *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir.2000) (stating that a court may consider "the pleadings and exhibits attached thereto" when ruling on a motion to dismiss)).

**3.** " '[W]hen the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern.' " *Crenshaw v. Lister*, 556 F.3d 1283, 1292 (11th Cir.2009) (quoting *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir.2007)).

**4.** This May 27, 2010 narrative, along with the narrative from the September 20, 2010 Incident Report, was written by Officer Alejandro Macias, who is not a party to this suit.

**5.** The date on the narrative is June 11, 2010; however, because the narrative is entitled "narrative supplement" and is attached to the May 27, 2010 Incident Report, the Court refers to this exhibit as the May 27, 2010 Incident Report.

While conducting a derelict vessel clean-up in Dinner Key Marina the above listed item was found within the vessel scheduled for cleanup (D.V. Case# 100610–174788) and recovered. The vessel was covered in garbage, the above item was seem to possibly have value and then turned into property under the owners name.

(Am. Compl. Ex. 3 (August 20, 2010 Incident Report).) The report indicates that the item recovered from the vessel was a "red inverter." (*Id.*) The September 20, 2010 City of Miami Police Department Incident Report narrative provides the following description of the events:

On Friday August 20, 2010 Officer Ricardo Roque # 27435 observed vessel to still be in its derelict condition and had it removed from state waters and destroyed by a city contractor.

(Am. Compl. Ex. 3 (September 20, 2010 Incident Report).)

Hoefling's Amended Complaint contains four counts against Defendants City of Miami, Gonzalez and Roque: (1) "intentional destruction of Plaintiff's property," (2) "negligent destruction of Plaintiff's property," (3) "violation of Plaintiff's constitutional rights of procedural due process," and (4) "violation of Plaintiff's Fourth Amendment right to protection from unreasonable searches and seizures." (*See id.* ¶¶ 18–32.) The Amended Complaint also contains a "demand for punitive damages" that is "[b]ased on Defendants' willful, wanton and egregious conduct" and "Defendants' intentional disregard for Plaintiff's property rights as guaranteed by the U.S. Constitution."[6] (*Id.* ¶ 33.)

On January 27, 2012, Defendants moved to dismiss the Amended Complaint and, in the alternative, moved to strike the demand for punitive damages. (Motion, D.E. 37.) In their Motion, Defendants appear to make the following arguments: (1) the Amended Complaint should be dismissed because it is a "shotgun pleading;" (2) Counts 1 and 2 should be dismissed because the general maritime law does not impose a duty of reasonable care upon a law enforcement officer with respect to the enforcement of the law; (3) Count 3 should be dismissed because Plaintiff has a post-deprivation remedy, and accordingly does not have a procedural due process claim under the Fourteenth Amendment; (4) Plaintiff has no claim under the Fifth Amendment because that amendment only applies to the federal government; (5) Plaintiff cannot bring a claim for unreasonable seizure under the Fourteenth Amendment; (6) Gonzalez and Roque are entitled to qualified immunity; and (7) Plaintiff is not entitled to punitive damages against the City of Miami. (*See* Motion 2–15.)

In response, Plaintiff appears to make the following arguments: (1) the Amended Complaint only contains four counts and thirty-three paragraphs and is therefore not a "shotgun pleading;" (2) because the Amended Complaint does not mention "enforcement of the law" the Court cannot consider the issue; (3) Plaintiff has pled this is a matter of admiralty and maritime law within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure; (4) Plaintiff has a claim under the Fourteenth Amendment because he alleges that the officers acted under the color of state law when they searched and seized his vessel; (5) Gonzalez and Roque are not entitled to qualified immunity because clearly established law required that the officers give Plaintiff notice before destroying his pos-

---

**6.** Along with the three City of Miami Police Department Incident Reports described above, Plaintiff also attached as exhibits to his Amended Complaint a "Certificate of Documentation" dated July 13, 2010 (Exhibit 1) and a photograph (Exhibit 2).

sessions, and the officers failed to do so; and (6) Plaintiff is entitled to punitive damages against Gonzalez and Roque. (*See* Response 2–12.) Plaintiff also states ·that the references in the Amended Complaint to the Fifth Amendment were made "in passing" and that "no cause of action was filed regarding the Fifth Amendment." (*Id.* at 7.)

## II.   Legal Standards

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a claim for "failure to state a claim upon which relief can be granted." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,·* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Conclusory statements, assertions or labels will not survive a 12(b)(6) motion to dismiss. *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.; see also Edwards v. Prime, Inc.,* 602 F.3d 1276, 1291 (11th Cir.2010) (setting forth the plausibility standard). In recent decisions, the Eleventh Circuit further advised that courts may make reasonable inferences in a plaintiff's favor, but they are not required to draw plaintiff's inference. *Sinaltrainal v. Coca–Cola,* 578 F.3d 1252, 1260 (11th Cir.2009) (quotations omitted).

The Eleventh Circuit has set forth a heightened pleading standard for claims brought pursuant to 42 U.S.C. § 1983, stating as follows:

> [T]his circuit, along with others, has tightened the application of Rule 8 [of the Federal Rules of Civil Procedure] with respect to § 1983 cases in an effort to weed out nonmeritorious claims, requiring that a § 1983 plaintiff allege with some specificity the facts which make out its claim. Thus, a plaintiff must allege some factual detail as the basis for a § 1983 claim.... [I]n a § 1983 action, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.

*Keating v. City of Miami,* 598 F.3d 753, 762–63 (11th Cir.2010) (internal citations and quotations omitted).

## III.   Discussion

### A.   Qualified Immunity

In their Motion to Dismiss, Defendants Roque and Gonzalez assert that they are entitled to qualified immunity on the non-constitutional tort claims (Counts 1 and 2) and the claims based on violations of the Fourteenth and Fourth Amendments (Counts 3 and 4).[7]

#### 1.   Constitutional Claims (Counts 3 and 4)

"Because qualified immunity is an entitlement not to stand trial or face the other burdens of litigation, ... questions of qualified immunity must be resolved at the earliest possible stage in litigation." *Gonzalez v. Reno,* 325 F.3d 1228, 1233 (11th Cir.2003); *see also Scott v. Harris,* 550 U.S. 372, 376 n. 2, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (stating that "[q]ualified immunity is an immunity from

---

**7.**   Plaintiff has stated that the references in the Amended Complaint to the Fifth Amendment were made "in passing" and that "no cause of action was filed regarding the Fifth Amend-ment." (Response 7.) Accordingly, the Court does not address any claims made under the Fifth Amendment in this Order.

suit rather than a mere defense to liability"). "Qualified immunity shelters government officials performing discretionary functions from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Corey Airport Servs., Inc. v. Decosta*, 587 F.3d 1280, 1284–85 (11th Cir.2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

"Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Behrens v. Pelletier*, 516 U.S. 299, 306, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)) (internal quotations omitted). To receive qualified immunity, the government official must first prove that he was acting within his discretionary authority. *Gonzalez*, 325 F.3d at 1234 (citing *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir.2002)). "A government official acts within his or her discretionary authority if objective circumstances compel the conclusion that challenged actions occurred in the performance of the official's duties and within the scope of this authority." *Hill v. Dekalb Reg'l Youth Detention Ctr.*, 40 F.3d 1176, 1185 n. 17 (11th Cir.1994). Here, the parties do not dispute that Officer Roque and Sergeant Gonzalez were acting within their discretionary authority at all relevant times.

"Once the defendants have established that they were acting within their discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Gonzalez*, 325 F.3d at 1234 (citing *Vinyard*, 311 F.3d at 1346). On a motion to dismiss, "[t]o evaluate claims of qualified immunity, the Court considers whether (1) the plaintiff has alleged a violation of a constitutional right; and (2) whether the right was 'clearly established' at the time of the defendant's misconduct." [8] *Rehberg v. Paulk*, 611 F.3d 828, 838–39 (11th Cir.2010). "Clearly established" means that "it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted." *Corey Airport Servs.*, 587 F.3d at 1285. "[T]he 'salient question' is whether the state of the law gave the official 'fair warning' that the alleged conduct was unconstitutional." *Grayden v. Rhodes*, 345 F.3d 1225, 1231–32 (11th Cir.2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740–41, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)).

Here, Plaintiff has not met his burden of showing that Officer Roque and Sergeant Gonzalez are not entitled to qualified immunity because he has not shown that Defendants violated his "clearly established" rights. Plaintiff cites to only two cases—only one of which the Court may consider [9]—in support of his argument

---

**8.** "These two steps do not have to be analyzed sequentially; if the law was not clearly established, [the Court] need not decide if the Defendants actually violated the Plaintiff's rights." *Fils v. City of Aventura*, 647 F.3d 1272, 1287 (11th Cir.2011) (citing *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir.2009)).

**9.** The second case Plaintiff cites to is *Pottinger v. City of Miami*, 810 F.Supp. 1551 (S.D.Fla. 1992). However, *Pottinger* is a district court case, which cannot "clearly establish" constitutional rights. *Amnesty Int'l USA v. Battle*, 559 F.3d 1170, 1184 (11th Cir.2009) (stating that "only the case law of the Supreme Court, the Eleventh Circuit or the law of the highest court of the state where the events took place—in this case, Florida—can 'clearly establish' constitutional rights" (quoting *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1032 n. 10 (11th Cir.2001))). Accordingly, the Court cannot consider the *Pottinger* case in this analysis.

that the seizure and destruction of his vessel and his personal possessions inside the vessel by Officer Roque and Sergeant Gonzalez violated clearly established law.

█ Plaintiff relies on *Soldal v. Cook County, Illinois,* 506 U.S. 56, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992). In *Soldal,* the Supreme Court held that the seizure and removal of a trailer home implicated the petitioners' Fourth Amendment right to be free from unreasonable seizures. The petitioners, Edward Soldal and his family, lived in a trailer home that was located on land owned by Terrace Properties. *Soldal,* 506 U.S. at 57–58, 113 S.Ct. 538. Terrace Properties and its manager, Margaret Hale, filed an eviction proceeding against the Soldals in state court. *Id.* at 58, 113 S.Ct. 538. Before the state court issued a judgment, and contrary to state law,[10] Terrace Properties and Hale chose to forcibly evict the Soldals. *Id.* Hale notified local law enforcement that she was planning on evicting the Soldals and requested the presence of sheriff deputies to forestall any resistance to the forcible eviction. *Id.* After the deputies arrived at the mobile home park, two employees of Terrace Properties pulled the Soldals' trailer from the foundation and towed it to another lot. *Id.* at 59, 113 S.Ct. 538. "Throughout this period, the deputy sheriffs knew that Terrace Properties did not have an eviction order and that its actions were unlawful." *Id.* A few days later, the state court judge assigned to the pending eviction proceedings ruled that the eviction was unauthorized and ordered Terrace Properties to return the Soldals' mobile home to its mobile home park. *Id.* However, the mobile home had been badly damaged as a result of the move. *Id.* The Soldals brought suit against the deputy sheriffs under 42 U.S.C. § 1983, alleging that they violated their rights under the Fourth and Fourteenth Amendments. *Id.* The Supreme Court found that the sheriffs' actions constituted a "seizure" under the Fourth Amendment, stating:

> As a result of the state action in this case, the Soldals' domicile was not only seized, it literally was carried away, giving new meaning to the term "mobile home." We fail to see how being unceremoniously dispossessed of one's home in the manner alleged to have occurred here can be viewed as anything but a seizure invoking the protection of the Fourth Amendment.

*Id.* at 61, 113 S.Ct. 538. However, the Supreme Court made no finding as to whether the sheriffs' actions violated the Fourth Amendment and remanded the case for a determination as to whether the seizure was reasonable under the Fourth Amendment. *Id.* at 72, 113 S.Ct. 538.

The facts in *Soldal* are distinguishable from those in this case. In *Soldal,* the deputy sheriffs were acting contrary to an Illinois state statute, which provided that a tenant could not be dispossessed without an order of eviction from a court. The Supreme Court found that while the deputy sheriffs were watching employees of Terrace Properties physically tear the mobile home from its foundation and tow it to another lot, "the deputy sheriffs knew that Terrace Properties did not have an eviction order and that its actions were unlawful." *Id.* at 59, 113 S.Ct. 538. Furthermore, the Supreme Court decided only that the deputy sheriffs' actions constituted a "seizure" under the Fourth Amendment; the Supreme Court made no determination as to whether the seizure was

---

**10.** A state statute provided that a tenant could not be dispossessed absent a judgment of evic-

tion. *Soldal,* 506 U.S. at 58, 113 S.Ct. 538.

unreasonable under the Fourth Amendment.

In contrast, here, the City of Miami Police Department Incident Reports provided in Exhibit 3 to the Amended Complaint and the City of Miami Office of Code Enforcement Notice attached as Exhibit 3 to the original Complaint show that at all relevant times Officer Roque and Sergeant Gonzalez were carrying out state law as set forth in Florida Statute Section 823.11. (*See* Am. Compl. Ex. 3 (May 27, 2010 Incident Report).) Florida Statute Section 823.11 addresses removal of abandoned and derelict vessels from public waters. The statute makes it "unlawful for any person ... to store, leave, or abandon any derelict vessel as defined in this section in this state." FLA. STAT. § 823.11(2). The statute defines a "derelict vessel" as "any vessel, as defined in s. 327.02, that is left, stored, or abandoned ... [i]n a wrecked, junked, or substantially dismantled condition upon any public waters of this state." [11] FLA. STAT. § 823.11(1)(a). [12] Furthermore, the statute "authorize[s] and empower[s]" law enforcement officers, such as Officer Roque and Sergeant Gonzalez, "to remove or cause to be removed any abandoned or derelict vessel from public waters in any instance when the same obstructs or threatens to obstruct navigation or in any way constitutes a danger to the environment." FLA. STAT. § 823.11(3)(a). [13]

Chapter 705 of the Florida Statutes provides procedures for the disposition of abandoned property by local governments when that property is found on public property. Pursuant to Florida Statute Section 705.103, when a law enforcement officer ascertains that an article of lost or abandoned property is present on public property and is of such nature that it can be easily removed, the officer shall take such article into custody and shall make a reasonable attempt to ascertain the rightful owner pursuant to the provisions of the statute. FLA. STAT. § 705.103(1). If the article of abandoned property present on public property cannot be easily removed, the statute directs the officer to place a notice on the article directing the owner to remove the article within five days; if the owner does not comply within the five days, the article will be removed and disposed of. FLA. STAT. § 705.103(2). Florida statutes define lost property and abandoned property as follows;

> "Lost property" means all tangible personal property which does not have an

---

11. A "vessel" is "synonymous with boat as referenced in s. 1(b), Art. VII of the State Constitution and includes every description of watercraft, barge, and airboat, other than a seaplane on the water, used or capable of being used as a means of transportation on water." FLA. STAT. § 327.02(39). There is no dispute that Hoefling's sailboat is a "vessel" under Florida law.

12. The statute also contains provisions regarding "derelict vessels" in ports and on private property; however, these provisions are not relevant to the facts of this case.

13. The statute specifically refers to the "Fish and Wildlife Conservation Commission and its officers and all law enforcement officers as specified in s. 327.70." FLA STAT.

§ 823.11(3)(a). Florida Statute Section 327.70 refers to "municipal police officers, and any other law enforcement officer as defined in s. 943.10." FLA. STAT. § 327.70. " 'Law enforcement officer' means any person who is elected, appointed, or employed full time by any municipality or the state or any political subdivision thereof; who is vested with authority to bear arms and make arrests; and whose primary responsibility is the prevention and detection of crime or the enforcement of the penal, criminal, traffic, or highway laws of the state." FLA. STAT. § 943.10(a). Neither party disputes that Officer Roque and Sergeant Gonzalez both fall within category of "law enforcement officer" under Florida Statute § 823.11(3)(a).

identifiable owner and which has been mislaid on public property, upon a public conveyance, on premises used at the time for business purposes, or in parks, places of amusement, public recreation areas, or other places open to the public in a substantially operable, functioning condition or which has an apparent intrinsic value to the rightful owner.

"Abandoned property" means all tangible personal property that does not have an identifiable owner and that has been disposed on public property in a wrecked, inoperative, or partially dismantled condition or has no apparent intrinsic value to the rightful owner. *The term includes derelict vessels as defined in s. 823.11(1).*

FLA. STAT. § 705.101(2), (3) (emphasis added).

In the May 27, 2010 Incident Report, Officer Macias noted that Hoefling's sailboat "is derelict, in that it is left stored and abandoned in an substantially dismantled condition upon public state waters." (Am. Compl. Ex. 3 (May 27, 2010 Incident Report).) The Incident Report further stated that the "sailboat has no motor, sails, helm or rudder for propulsion or steering." (*Id.*) Officer Macias noted that on May 27, 2010, he contacted Hoefling, spoke with him "about the condition of his vessel," and "advised him that it needs to be removed or brought into compliance with the law as per Florida State Statute 823.11." (*Id.*) Finally, the Incident Report indicated that Hoefling told Officer Macias that "he was going to comply with the law as soon as he was able." (*Id.*) Furthermore, on May 27, 2010, Officer Macias left a notice on Hoefling's sailboat which stated that the vessel was unlawfully on the property. (*See* Compl., D.E. 1, Ex. 3 (Notice).) Nearly three months after Hoefling received notice that his vessel was considered "derelict" and subject to removal pursuant to Florida Statute 823.11, on August 20, 2010 Officer Roque observed the vessel "covered with garbage." (Am. Compl. Ex. 3 (August 20, 2010 Incident Report).) After recovering a generator from the vessel because it may "possibly have value," *id.*, Officer Roque had the vessel "removed from state waters and destroyed by a city contractor." (Am. Compl. Ex. 3 (September 20, 2010 Incident Report).)

Accordingly, the facts of this case show that on May 27, 2010, Officer Macias provided proper notice to Hoefling pursuant to Florida Statute Section 705.103(2) because he left a City of Miami Office of Code Enforcement Notice on the vessel and he additionally spoke with Hoefling about the derelict condition of the vessel and told him that the vessel must be brought into compliance or removed under Florida Statute Section 823.11. The statute requires only that the owner of the derelict vessel be given five days notice to remove the vessel before the municipality removes and destroys the vessel. *See* FLA. STAT. § 705.103(2). Here, Hoefling was provided nearly three months to remove the vessel. Because he failed to do so, Officer Roque, ordered the vessel to be destroyed pursuant to Florida Statutes 823.11 and 705.103(2). Before ordering the vessel to be removed from public waters and destroyed, Officer Roque complied with Florida Statute 705.103(1), in that he boarded the vessel, removed a generator which he believed "possibly [had] value," and took the generator into custody under Hoefling's name.

Plaintiff has cited to no case from the United States Supreme Court, the Eleventh Circuit Court of Appeals, or the Florida Supreme Court that holds that an officer complying with the procedures for derelict vessels and abandoned property as set forth in Florida Statute 823.11 and/or Florida Statute 705.103 violates a

"clearly established" right. Accordingly, the Court finds that it would not be clear to a reasonable law enforcement officer that his conduct in complying with the notice requirements as set forth in Florida Statute 705.103 and his conduct in removing a derelict vessel from public waters as set forth in Florida Statute 823.11, as Officer Roque and Sergeant Gonzalez did in this case, was unlawful. *See Corey Airport Servs.*, 587 F.3d at 1285. Therefore, Officer Roque and Sergeant Gonzalez are entitled to qualified immunity as to the claims brought pursuant to 42 U.S.C. § 1983.

### 2. Non-constitutional Maritime Torts (Counts 1 and 2)

■ Although there is very little case law on the issue, in the Eleventh Circuit, the doctrine of qualified immunity also appears to apply to non-constitutional maritime torts. *See Harrell v. United States,* 875 F.2d 828, 831 (11th Cir.1989) (summarily stating that "[t]he same considerations which apply to the constitutional claims demonstrate Lt. Atkin's entitlement to qualified immunity for the alleged non-constitutional maritime torts" and remanding the case to the district court "with instructions to dismiss the claims against Lt. Atkin on the grounds of qualified immunity"). The qualified immunity issues in maritime tort cases are governed by the same legal principles that apply when a government agent is sued under 42 U.S.C. § 1983. *Sol v. City of Miami,* 776 F.Supp.2d 1375, 1380 (S.D.Fla.2011); *see Harrell,* 875 F.2d at 831.

■ Plaintiff has not met his burden of showing that Officer Roque and Sergeant Gonzalez are not entitled to qualified immunity because he has not shown that Defendants violated his "clearly established" rights. Plaintiff again only cites to *Soldal,* 506 U.S. 56, 113 S.Ct. 538, which is

distinguishable from this case, *see supra* Part III.A.1, and to *Pottinger,* 810 F.Supp. 1551, which, because it is a district court case, cannot "clearly establish" constitutional rights; *see supra* n. 9. Plaintiff's only other argument is that the officers violated his "clearly established" rights because they failed to follow Florida Statute Section 823.11. However, the Court already found that Officer Roque and Sergeant Gonzalez complied with the procedures for derelict vessels and abandoned property as set forth in Florida Statute Sections 823.11 and 705.103. *See supra* Part III.A.1. Accordingly, because Plaintiff has failed to meet his burden of showing that the officers violated his "clearly established" rights, Officer Roque and Sergeant Gonzalez are entitled to qualified immunity on the non-constitutional maritime tort claims.

### B. Section 1983 Claims Against the City of Miami (Counts 3 and 4)

In Counts 3 and 4 of the Amended Complaint, Hoefling attempts to allege two claims under 42 U.S.C. § 1983 against the City of Miami. "The Supreme Court has placed strict limitations on municipal liability under section 1983." *Gold v. City of Miami,* 151 F.3d 1346, 1350 (11th Cir. 1998). "[A] municipality may be held liable for the actions of a police officer only when municipal 'official policy' causes a constitutional violation." *Id.* (citing *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 694–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)); *see also Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 166, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (stating that "a municipality can be sued under § 1983, but it cannot be held liable unless a municipal policy or custom caused the constitutional injury"). A plaintiff may show a policy by identifying either 1) "an officially

promulgated [city] policy or 2) an unofficial custom or practice of the [city] shown through repeated acts of a final policymaker of the [city]." *Grech v. Clayton Cnty., Ga.,* 335 F.3d 1326, 1329–30 (11th Cir.2003) (citing *Monell,* 436 U.S. at 690–91, 98 S.Ct. 2018; *Brown v. Neumann,* 188 F.3d 1289, 1290 (11th Cir.1999)). "Because a [city] rarely will have an officially-adopted policy of permitting a particular constitutional violation, most plaintiffs ... must show that the [city] has a custom or practice of permitting it and that the [city's] custom or practice is the 'the moving force behind the constitutional violation.'" *Id.* at 1330 (footnote omitted) (quoting *City of Canton v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). Furthermore, a plaintiff "must also identify an official who speaks with 'final policymaking authority for [the municipality] concerning the act alleged to have caused the particular constitutional violation in issue.'" *Reyes v. City of Miami Beach,* Case No. 07–22680–CIV, 2008 WL 686958, at *12 (S.D.Fla. Mar. 13, 2008) (quoting *Grech,* 335 F.3d at 1330). "Indeed, 'municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'" *Id.* (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)).

■ Here, in Counts 3 and 4 of the Amended Complaint, Hoefling claims that the City of Miami violated his constitutional rights as set forth in the Fourth and Fourteenth Amendments. However, Hoefling fails to allege the two other necessary elements for a § 1983 claim against a city; Hoefling does not identify an official practice or custom that is the moving force behind the alleged constitutional violations, and he does not identify a responsible city official who speaks with final policymaking authority for City of Miami concerning the act alleged to have caused the particular constitutional violations at issue. *See Reyes,* 2008 WL 686958, at *12. Accordingly, because Hoefling has failed to allege the necessary elements of a claim under 42 U.S.C. § 1983 against the City of Miami, Counts 3 and 4 of the Amended Complaint against the City of Miami are dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

**C. Maritime Tort Claims Against the City of Miami (Counts 1 and 2)**

■ Hoefling's Amended Complaint contains two tort counts against Defendants: (1) "intentional destruction of Plaintiff's property," and (2) "negligent destruction of Plaintiff's property." (Am. Compl. ¶¶ 18–25.) A local government entity cannot assert sovereign immunity as a defense to an admiralty suit. *See Northern Ins. Co. of New York v. Chatham Cnty., Ga.,* 547 U.S. 189, 196–97, 126 S.Ct. 1689, 164 L.Ed.2d 367 (2006). Local governments have been held liable for the maritime torts of their employees. *See Workman v. City of New York,* 179 U.S. 552, 573, 21 S.Ct. 212, 45 L.Ed. 314 (1900) (stating that "[a] recovery can be had *in personam* ... for a maritime tort when the relation existing between the owner and the master and crew of the vessel, at the time of the negligent collision, was that of master and servant" and further finding that the City of New York could be held liable for its employees' negligence resulting in a collision of its fireboat with another vessel); *cf. Central Rivers Towing, Inc. v. City of Beardstown,* 750 F.2d 565, 570 (7th Cir. 1984) (finding that the City of Beardstown was liable for damages to a vessel because "the City was negligent in failing to remove the pier remains after they became a hazard to navigation"); *Pelican Marine*

*Carriers, Inc. v. City of Tampa*, 791 F.Supp. 845, 854 (M.D.Fla.1992) (finding the City of Tampa liable for damage to a vessel when that vessel hit a submerged sewer line because "[a]s the owner of the sewer line, the City had the duty to warn mariners of submerged hazards to navigation"). Accordingly, the Court turns to the merits of Plaintiff's tort claims.

▮▮▮▮ "General maritime law incorporates the general law of torts when not inconsistent with the law of admiralty." *Harrison v. Flota Mercante Grancolombiana, S.A.*, 577 F.2d 968, 977 (5th Cir.1978) (citations omitted).[14] "The elements of maritime negligence are essentially the same as those for common law negligence."[15] *Crayton v. Oceania Cruises, Inc.*, 600 F.Supp.2d 1271, 1275 (S.D.Fla. 2009) (citing *Stuart Cay Marina v. M/V Special Delivery*, 510 F.Supp.2d 1063, 1071 (S.D.Fla.2007)). "Generally, the elements necessary to prove a cause of action for negligence are: (1) a duty recognized by the law requiring a certain standard of conduct for the protection of others against unreasonable risks; (2) breach of the duty; (3) a reasonably close causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting to the interests of another." *Id.* (citation omitted); *see also Stuart Cay Marina*, 510 F.Supp.2d at 1070–71 (stating that "to make out a *prima facie* case of maritime negligence, a plaintiff must establish that the defendant owed a duty to the plaintiff under the law to conform to a particular standard of conduct in order to protect others against an unreasonable risk of harm, that the defendant breached such duty, and that the breach harmed plaintiff in a manner that the duty of reasonable care seeks to prevent).

▮▮▮▮ Plaintiff alleges that "Defendants had a duty to protect Plaintiff's property, including his vessel and his personal belongings from intentional and unreasonable search and seizures, and that they "intentionally breached their duty when they unlawfully and intentionally searched, seized and destroyed Plaintiff's property and ordered the destruction of Plaintiff's vessel and his personal property without legal authority." (Am. Compl. ¶¶ 19, 20, 23, 24.) Defendants argue that "general maritime law does not impose a duty of reasonable care upon a law enforcement officer with respect to the enforcement of the law." (Motion 4). In his Response, Plaintiff merely asserts that his Amended Complaint did not make any allegation regarding "the enforcement of the law." (*See* Response 3–5.) However, Plaintiff overlooks the fact that he attached to his Amended Complaint three City of Miami Police Department Incident Reports. In those Incident Reports, Officer Macias noted on May 27, 2010 that Hoefling's vessel "is derelict," and "advised [Hoefling] that it needs to be removed or brought into compliance with the law as per Florida State Statute 823.11." (Am. Compl. Ex. 3 (Incident Reports).) In the September 20, 2010 Incident Report, Officer Macias noted that "on Friday, August

---

14. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), the Eleventh Circuit adopted as binding precedent all decisions handed down by the former Fifth Circuit before October 1, 1981.

15. Because Plaintiff asserts that the vessel was located on navigable waters of the United States and that the vessel was "involved in the traditional maritime activity of being at anchor in navigable waters" when Defendants Gonzalez and Roque allegedly searched and subsequently ordered the vessel to be destroyed (*see* Am. Compl. ¶ 7), "federal maritime law governs the substantive issues in the case," *Everett v. Carnival Cruise Lines*, 912 F.2d 1355, 1358 (11th Cir.1990) (citations omitted).

20, 2010 Officer Ricardo Roque ... observed vessel to still be in its derelict condition and had it removed from state waters and destroyed by a city contractor." (*Id.*) Therefore, although Plaintiff's conclusory allegations in the Amended Complaint do not mention "enforcement of the law," the Incident Reports attached as exhibits to the Amended Complaint show that during all relevant periods, the officers were enforcing the provisions of Florida Statute Section 823.11. Plaintiff does not cite to any case—and the Court is unaware of any case—that states that under maritime law, police officers owe a duty of care to an individual member of the public with respect to the enforcement of the law.[16][17] Accordingly, the Court finds that because Defendants did not owe a duty of care to Plaintiff with respect to the enforcement of the law, the tort claims must dismissed for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## IV. Conclusion

Accordingly, it is **ORDERED AND ADJUDGED** that:

1. Defendants' Motion to Dismiss Amended Complaint (D.E. 37), filed on January 27, 2012, is **GRANTED;**

2. Plaintiff James Edward Hoefling, Jr.'s Amended Complaint (D.E. 33), filed on January 5, 2012, is **DISMISSED;**

3. All pending motions are **DENIED AS MOOT;** and

4. This case is now **CLOSED.**

---

16. Even under Florida law, which the Court may be able to apply in the absence of applicable maritime law, *see Steelmet, Inc. v. Caribe Towing Corp.*, 779 F.2d 1485, 1488 (11th Cir.1986), "there is no 'common law duty of care owed to an individual with respect to the discretionary judgmental power granted a police officer ... to enforce the law,'" *Albra v. City of Fort Lauderdale*, 232 Fed.Appx. 885, 888 (11th Cir.2007) (quoting *Everton v. Willard*, 468 So.2d 936, 938 (Fla.1985)); *cf. Tria-*

*non Park Condominium Ass'n v. City of Hialeah*, 468 So.2d 912 (Fla.1985) (explaining that governmental entities are immune when making the basic decision of how to enforce the laws).

17. Moreover, the Court notes that in his Response, Plaintiff does not cite to *any* case that sets forth the applicable duty of care.