**James Edward HOEFLING, Jr., Plaintiff,**

v.

**CITY OF MIAMI, Ricardo Roque, and Jose Gonzalez, Defendants.**

**Case No. 11–22358–CIV.**

United States District Court, S.D. Florida.

Signed May 6, 2014.

---

Richard J. Ovelmen, Jason Patrick Kairalla, Carlton Fields Jorden Burt, P.A., Michael N. Wolgin, Jorden Burt LLP, Miami, FL, for Plaintiff.

Warren Bittner, Miami City Attorney's Office, Miami, FL, Ronald Jay Cohen, Rice Pugatch Robinson & Schiller, P.A., Ft. Lauderdale, FL, for Defendants.

## *ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT AND MOTION TO STRIKE DEMAND FOR PUNITIVE DAMAGES (D.E. 68), DISMISSING PLAINTIFF'S SECOND AMENDED COMPLAINT (D.E. 65), AND CLOSING CASE*

JOAN A. LENARD, District Judge.

**THIS CAUSE** is before the Court on Defendants' Motion to Dismiss Second Amended Complaint and Motion to Strike Demand for Punitive Damages ("Motion," D.E. 68), filed April 25, 2014. Plaintiff filed a Response on May 28, 2013 ("Response," D.E. 71), to which Defendants filed a Reply on June 21, 2013 ("Reply,"

D.E. 78). By leave of the Court (D.E. 80), Plaintiff filed a sur-reply on July 4, 2013 ("Sur-reply," D.E. 81). Upon review of the Motion, Response, Reply, Sur-reply, and the record, the Court finds as follows.

## I. Background[1]

█ This is a case related to the destruction of a vessel called the "METIS 0." Plaintiff James Edward Hoefling, Jr. ("Hoefling") owned and lived on the "METIS 0." In his Second Amended Complaint ("SAC"), Hoefling alleges that on August 20, 2010, two officers from the City of Miami Police Department's Marine Patrol Detail, Sergeant Jose Gonzalez ("Gonzalez"), and Officer Ricardo Roque ("Roque"), searched the "METIS 0," removed a generator, destroyed the vessel and the rest of Hoefling's personal belongings, and committed the remains to a trash dumpster. (SAC ¶ 10.) Hoefling alleges that the officers destroyed his vessel without providing him notice (*id.* ¶ 11); however, this assertion is contradicted by an exhibit attached to the original Complaint[2] and an exhibit attached to the First Amended Complaint ("FAC," D.E. 33).[3]

Plaintiff provided as an exhibit to his original Complaint a document entitled "City of Miami Office of Code Enforcement NOTICE," which was signed by Officer Alejandro Macias and dated May 27, 2010. (Compl., D.E. 1, Ex. 3 (Notice).)

This Notice was attached to Plaintiff's vessel and informed Plaintiff that the vessel was unlawfully on the property. (*See id.*)

Plaintiff provided as an exhibit to the FAC three City of Miami Police Department Incident Reports, dated May 27, 2010, August 20, 2010, and September 20, 2010 (Exhibit 3). The narrative from the May 27, 2010 City of Miami Police Department Incident Report shows that Hoefling had notice of the derelict condition of the vessel and provides the following description of the events:

> Above listed sailboat with HIN No. FLZK9098D980 is derelict, in that it is left stored and abandoned in a substantially dismantled condition upon public state waters. Listed sailboat has no motor, sails, helm or rudder for propulsion or steering. On May 27, 2010 this officer contacted Mr. James Edward Hoefling Jr on the above listed boat about the condition of his vessel and advised him that it needs to be removed or brought into compliance with the law as per Florida State Statute 823.11.

> Vessel is located at coordinates N2542.962' W08013.188'

> *Note–Mr. Hoefling advised this officer that he is going to install an anchor light on the vessel and that he was going to comply with the law as soon as he is able.

---

**1.** Unless otherwise noted, the following facts are gleaned from Plaintiff's Second Amended Complaint (D.E. 65), and are deemed to be true for purposes of Defendants' Motion.

**2.** "In determining whether an amended complaint should be dismissed for failure to state a claim upon which relief can be granted, a court may rely on documents attached to the original complaint." *Jackson v. Cutchins,* 2011 WL 1124219, at *3 n. 2 (N.D.Fla. Feb. 11, 2011) (citing *Gross v. White,* 340 Fed. Appx. 527, 534 (11th Cir.2009) ("A district court ruling on a motion to dismiss is not

required to disregard documents that the plaintiff himself filed with his original complaint."); *Grossman v. Nationsbank, N.A.,* 225 F.3d 1228, 1231 (11th Cir.2000) (stating that a court may consider "the pleadings and exhibits attached thereto" when ruling on a motion to dismiss)).

**3.** " '[W]hen the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern.' " *Crenshaw v. Lister,* 556 F.3d 1283, 1292 (11th Cir.2009) (quoting *Griffin Indus., Inc. v. Irvin,* 496 F.3d 1189, 1206 (11th Cir.2007)).

(FAC Ex. 3 (May 27, 2010 Incident Report).) [4],[5] The August 20, 2010 City of Miami Police Department Incident Report narrative, written by Officer Ricardo Roque, provides the following description of the events:

> While conducting a derelict vessel cleanup in Dinner Key Marina the above listed item was found within the vessel scheduled for cleanup (D.V. Case# 100610–174788) and recovered. The vessel was covered in garbage, the above item was seem to possibly have value and then turned into property under the owners name.

(FAC Ex. 3 (August 20, 2010 Incident Report).) The report indicates that the item recovered from the vessel was a "red inverter." (*Id.*) The September 20, 2010 City of Miami Police Department Incident Report narrative provides the following description of the events:

> On Friday August 20, 2010 Officer Ricardo Roque # 27435 observed vessel to still be in its derelict condition and had it removed from state waters and destroyed by a city contractor.

(FAC Ex. 3 (September 20, 2010 Incident Report).)

Hoefling's Second Amended Complaint contains five counts against Defendants City of Miami, Gonzalez, and Roque: (1) "Substantive and Procedural Due Process Violation" (SAC ¶¶ 41–47); (2) "Unreasonable Search and Seizure" (*id.* ¶¶ 48–55); (3) "Intentional Destruction of Property" (*id.* ¶¶ 56–59); (4) "Negligent Destruction of Property" (*id.* ¶¶ 60–66); and (5) "Takings" (*id.* ¶¶ 64–66). The SAC also contains a prayer for relief that includes puni-

tive damages "based on defendants' willful conduct ... and their intentional disregard for plaintiff's property rights as guaranteed by the United States Constitution[.]" (*Id.* at 13.)

On April 25, 2013, Defendants moved to dismiss the SAC and to strike Plaintiff's demand for punitive damages. (Motion, D.E. 68.) In their Motion, Defendants make the following arguments: (1) Plaintiff's substantive due process claim is precluded; (2) even if the substantive due process claim is not precluded the officers' conduct is not "conscience shocking"; (3) Plaintiff's procedural due process claim fails because he was provided proper notice; (4) Plaintiff's procedural due process claim fails because he has an adequate post-deprivation remedy; (5) Plaintiff's claims in Counts III and IV for intentional and negligent destruction of property, respectively, fail because general maritime law does not impose a duty of reasonable care upon a law enforcement officer with respect to the enforcement of the law; (6) Plaintiff's claim under the Fourth and Fourteenth Amendments for unreasonable search and seizure fail because the search and seizure was reasonable; (7) Plaintiff's Takings claim fails because enforcing Florida's Derelict Vessel Statute, which requires a vessel to be properly maintained or be removed from public waters, does not constitute a taking; (8) Gonzalez and Roque are entitled to qualified immunity; and (9) Plaintiff is not entitled to punitive damages. (*Id.* at 7–19.)

In response, Plaintiff appears to make the following arguments: (1) Defendants' Motion is improperly based upon materials

---

**4.** This May 27, 2010 narrative, along with the narrative from the September 20, 2010 Incident Report, was written by Officer Alejandro Macias, who is not a party to this suit.

**5.** The date on the narrative is June 11, 2010; however, because the narrative is entitled "narrative supplement" and is attached to the May 27, 2010 Incident Report, the Court refers to this exhibit as the May 27, 2010 Incident Report.

outside the SAC that should not be considered;[6] (2) the reasonableness of the officers' search and seizure is a question of fact not properly before the Court at the Motion to Dismiss stage; (3) the officers did not designate the vessel as "derelict" and therefore did not provide notice to Plaintiff that it was subject to destruction; (4) Defendants' post-deprivation remedy argument is flawed because there is no remedy that could undo the destruction of Plaintiff's vessel; (5) Defendants' argument that they cannot be held liable for intentional or negligent destruction of property is flawed because the destruction of Plaintiff's vessel was not within the scope of their discretionary authority; (6) Defendants' Takings argument is flawed because Plaintiff is not challenging the Derelict Vessel Statute but rather that Defendants' failure to provide Plaintiff notice violated the Statute's procedures for destroying a derelict vessel; and (7) punitive damages are an available remedy. (Response at 8–19.)

## II. Legal Standards

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a claim for "failure to state a claim upon which relief can be granted." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Conclusory statements, assertions or labels will not survive a 12(b)(6) motion to dismiss. *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.; see also Edwards v. Prime, Inc.,* 602 F.3d 1276, 1291 (11th Cir.2010) (setting forth the plausibility standard). In recent decisions, the Eleventh Circuit further advised that courts may make reasonable inferences in a plaintiff's favor, but they are not required to draw plaintiff's inference. *Sinaltrainal v. Coca–Cola,* 578 F.3d 1252, 1260 (11th Cir.2009).

The Eleventh Circuit has set forth a heightened pleading standard for claims brought pursuant to 42 U.S.C. section 1983, stating as follows:

> [T]his circuit, along with others, has tightened the application of Rule 8 [of the Federal Rules of Civil Procedure] with respect to § 1983 cases in an effort to weed out nonmeritorious claims, requiring that a § 1983 plaintiff allege with some specificity the facts which make out its claim. Thus, a plaintiff must allege some factual detail as the basis for a § 1983 claim.... [I]n a § 1983 action, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.

*Keating v. City of Miami,* 598 F.3d 753, 762–63 (11th Cir.2010) (internal citations and quotations omitted).

## III. Discussion

### A. Qualified Immunity

In their Motion, Defendant's Gonzalez and Roque assert that they are entitled to qualified immunity on the claims based on Fourth and Fourteenth Amendment viola-

---

**6.** Insofar as Plaintiff argues that the Court must ignore the exhibits attached to previous versions of his Complaint, the Court summarily rejects this argument for the reasons stated in footnote 2, *supra.* (Citing, *inter alia,* *Gross,* 340 Fed.Appx. at 534 ("A district court ruling on a motion to dismiss is not required to disregard documents that the plaintiff himself filed with his original complaint."))

tions (Counts I and II) and the non-constitutional tort claims for intentional and negligent destruction of property (Counts III and IV).

### 1. Claims brought under the Fourth and Fourteenth Amendments (Counts I and II)

■ "Because qualified immunity is an entitlement not to stand trial or face the other burdens of litigation, ... questions of qualified immunity must be resolved at the earliest possible stage in litigation." *Gonzalez v. Reno,* 325 F.3d 1228, 1233 (11th Cir.2003); *see also Scott v. Harris,* 550 U.S. 372, 376 n. 2, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (stating that "[q]ualified immunity is an immunity from suit rather than a mere defense to liability"). "Qualified immunity shelters government officials performing discretionary functions from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Corey Airport Servs., Inc. v. Decosta,* 587 F.3d 1280, 1284–85 (11th Cir. 2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

■ "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Behrens v. Pelletier,* 516 U.S. 299, 306, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)) (internal quotations omitted). To receive qualified immunity, the government official must first prove that he was acting within his discretionary authority. *Gonzalez,* 325

F.3d at 1234 (citing *Vinyard v. Wilson,* 311 F.3d 1340, 1346 (11th Cir.2002)). "A government official acts within his or her discretionary authority if objective circumstances compel the conclusion that challenged actions occurred in the performance of the official's duties and within the scope of this authority." *Hill v. Dekalb Reg'l Youth Detention Ctr.,* 40 F.3d 1176, 1185 n. 17 (11th Cir.1994).

■ The Parties dispute whether the Defendant Officers were acting within their discretionary authority. Plaintiff's argument—which is relegated to a footnote—is that Defendants have not demonstrated that the conduct alleged in the SAC falls within the scope of their discretionary authority. (Response at 16–17 n. 11.) Defendants argue that the Eleventh Circuit's seminal decision on the issue, *Rich v. Dollar,* 841 F.2d 1558 (11th Cir. 1988), commands the conclusion that they were acting within their discretionary authority. (Reply at 6–7.) In *Rich,* the court of appeals explained that a "government official can prove he acted within the scope of his discretionary authority by showing 'objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority.'" 841 F.2d at 1564 (quoting *Barker v. Norman,* 651 F.2d 1107, 1121 (5th Cir.1981) [7] and citing *Douthit v. Jones,* 619 F.2d 527 (5th Cir. 1980)); *see also Holloman ex rel. Holloman v. Harland,* 370 F.3d 1252, 1265 (11th Cir.2004) (defining the discretionary function inquiry as whether the government employee was "(a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize"). The

---

7. All Fifth Circuit decisions handed down prior to the close of business on September 30, 1981, are binding precedent upon the Eleventh Circuit. *Bonner v. Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

Court finds that Roque and Gonzalez were acting within their discretionary authority when they "declare[d] the vessel derelict" (SAC ¶ 38) and subsequently "seized and destroyed his home along with all the rest of his possessions" (*id.* ¶ 20).

According to the SAC, "[t]he two sources of legislative authority for the investigation and destruction of lost, abandoned, or derelict vessels are chapter 705 and section 823.11, Florida Statutes." (SAC ¶ 25.) "[C]hapter 705 provides that law enforcement shall take lost/abandoned property into custody, if easily removable from the public property ... [but] [i]f not easily removable, law enforcement is required to place on the lost or abandoned property, a notice in the form set forth in Florida Statute [section] 705.103(2)." [8] (*Id.* ¶ 28.) Additionally, "law enforcement personnel are authorized by Florida Statute [section] 823.11 to remove derelict vessels from state waters if that vessel is a hazard to navigation or a threat to the environment." (*Id.* ¶ 29.)

Prior to having the vessel destroyed, Gonzalez and Roque, while on duty in their capacity as Marine Patrol Detail for the City of Miami Police Department, advised Hoefling that his vessel was derelict and needed to be removed or brought into compliance. (FAC Ex. 3 (May 27, 2010 Incident Report). Nearly three months later, "[w]hile conducting a derelict vessel cleanup in Dinner Key Marina the above listed item [9] was found within the vessel scheduled for cleanup (D.V. Case# 100610–174788) and recovered. The vessel was covered in garbage, the above item was seem to possibly have value and then turned into property under the owners name." (*Id.*) "On Friday August 20, 2010 Officer Ricardo Roque # 27435 observed vessel to still be in its derelict condition and had it removed from state waters and destroyed by a city contractor." (*Id.* (September 20, 2010 Incident Report).) The Court finds that these are objective circumstances that compel the conclusion that Gonzalez and Roque's actions were undertaken pursuant to the performance of their duties and within the scope of their authority. *Rich,* 841 F.2d at 1564 (quoting *Barker,* 651 F.2d at 1121); *see also O'Rourke v. Hayes,* 378 F.3d 1201, 1205 (11th Cir.2004) ("[I]n determining 'whether a police officer may assert qualified immunity against a Fourth Amendment claim, we do not ask whether he has the right to engage in unconstitutional searches and seizures, but whether engaging in searches and seizures in general is a part of his job-related powers and responsibilities.' ") (quoting *Holloman,* 370 F.3d at 1266).

■ "Once the defendants have established that they were acting within their discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Gonzalez,* 325 F.3d at 1234 (citing *Vinyard,* 311 F.3d at 1346). On a motion to dismiss, "[t]o evaluate claims of qualified immunity, the Court considers whether (1) the plaintiff has alleged a violation of a constitutional right; and (2) whether the right was 'clearly established' at the time of the defendant's misconduct." [10] *Rehberg v. Paulk,* 611

---

8. The term "abandoned property" "includes derelict vessels as defined in s. 823.11(1)." Fla. Stat. 704.101(3).

9. As previously mentioned, the report indicates that the item recovered from the vessel was a "red inverter."

10. "These two steps do not have to be analyzed sequentially; if the law was not clearly established, [the Court] need not decide if the Defendants actually violated the Plaintiff's rights." *Fils v. City of Aventura,* 647 F.3d 1272, 1287· (11th Cir.2011) (citing *Oliver v. Fiorino,* 586 F.3d 898, 905 (11th Cir.2009)).

F.3d 828, 838–39 (11th Cir.2010). It is undisputed that Plaintiff has alleged a violation of a constitutional right. Thus, the question turns to "whether the right was 'clearly established' at the time of the defendant's misconduct." *Id.* "Clearly established" means that "it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted." *Corey Airport Servs.*, 587 F.3d at 1285. "[T]he 'salient question' is whether the state of the law gave the official 'fair warning' that the alleged conduct was unconstitutional." *Grayden v. Rhodes*, 345 F.3d 1225, 1231–32 (11th Cir.2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740–41, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)).

Neither Plaintiff's Response nor his Surreply so much as mention a "clearly established" right, much less "show" that the right Defendants allegedly violated was a clearly established one. Rather, with respect to Defendants' entitlement to qualified immunity on the Constitutional Claims, Plaintiff's entire argument—again, relegated to a footnote—is that Defendants have not established that they were acting within their discretionary authority when seizing and destroying the vessel. (*See* Response at 16–17 n. 11.) However, the Court has already determined that Defendants were acting within their discretionary authority when taking the actions described in the SAC. Because Plaintiff cites the Court to *no* case or statute establishing that the seizure and destruction of a vessel, determined to be derelict by marine patrolmen acting in their discretionary authority, violates a clearly established constitutional right, he has not satisfied his burden of showing that qualified immunity is inappropriate.[11] Accordingly, the Court

---

11. The Court is compelled to note that the apparent reason for Plaintiff's failure to allege a violation of a "clearly established" right is that in its Order Granting Defendants' Motion to Dismiss the FAC the Court determined the actions alleged did *not* violate a clearly established constitutional right. After analyzing the state statutory framework and finding that Gonzalez and Roque had complied with its mandates, the Court concluded:

> Plaintiff has cited to no case from the United States Supreme Court, the Eleventh Circuit Court of Appeals, or the Florida Supreme Court that holds that an officer complying with the procedures for derelict vessels and abandoned property as set forth in Florida Statute 823.11 and/or Florida Statute 705.103 violates a "clearly established" right. Accordingly, the Court finds that it would not be clear to a reasonable law enforcement officer that his conduct in complying with the notice requirements as set forth in Florida Statute 705.103 and his conduct in removing a derelict vessel from public waters as set forth in Florida Statute 823.11, as Officer Roque and Sergeant Gonzalez did in this case, was unlawful. *See Corey Airport Servs.*, 587 F.3d at 1285. Therefore, Officer Roque and Sergeant Gonzalez are enti-

tled to qualified immunity as to the claims brought pursuant to 42 U.S.C. § 1983.

*Hoefling v. City of Miami*, 876 F.Supp.2d 1321, 1330–31 (S.D.Fla.2012). Plaintiff tries to escape this prior finding by not attaching (and disavowing) the exhibits he attached to his original Complaint and the FAC, and by relying on the conclusory and self-serving allegations that "(1) plaintiff's vessel *was not* 'derelict' prior to its destruction ... (2) plaintiff Hoefling *did not* received [sic] adequate notice that his vessel was in danger of destruction ... and (3) the officers *were not* acting within the bounds of their discretion when they entered, seized, and destroyed plaintiff Hoefling's home...." (Sur-reply at 2.) First, the question for the Court under the qualified immunity analysis is not whether Hoefling's vessel was derelict, but rather whether Gonzalez and Roque were acting within their discretionary authority when they determined it was. *See O'Rourke*, 378 F.3d at 1205 ("[I]n determining 'whether a police officer may assert qualified immunity against a Fourth Amendment claim, we do not ask whether he has the right to engage in unconstitutional searches and seizures, but whether engaging in searches and seizures in general is a part of his job-related powers and responsibilities.'") (quoting *Holloman*, 370 F.3d at

concludes that Gonzalez and Roque are entitled to qualified immunity as to Counts 1 and 2.

### 2. Non–Constitutional Maritime Torts (Counts III and IV)

■ Counts III and IV are maritime tort claims for intentional and negligent destruction of property, respectively. (SAC ¶¶ 56–63.) Although there is very little case law on the issue, in the Eleventh Circuit, the doctrine of qualified immunity also appears to apply to non-constitutional maritime torts. *See Harrell v. United States*, 875 F.2d 828, 831 (11th Cir.1989) (summarily stating that "[t]he same considerations which apply to the constitutional claims demonstrate Lt. Atkin's entitlement to qualified immunity for the alleged non-constitutional maritime torts" and remanding the case to the district court "with instructions to dismiss the claims against Lt. Atkin on the grounds of qualified immunity"). The qualified immunity issues in maritime tort cases are governed by the same legal principles that apply when a government agent is sued under 42 U.S.C. § 1983. *Sol v. City of Miami*, 776 F.Supp.2d 1375, 1380 (S.D.Fla.2011); *see also Harrell*, 875 F.2d at 831.

■ Defendants contend that they are entitled to qualified immunity for Counts III and IV. (Motion at 16–19.) Plaintiff's one-paragraph response to this claim rests on the assertion that Defendants were not "acting within the scope of their discretionary authority [because] [t]hey lack the legal authority or discretion to summarily destroy private property, which is the exact conduct alleged as the basis for plaintiff's claims." (Response at 17.) The Court disagrees. As explained in the Court's Order Granting Defendants' Motion to Dismiss the FAC:

> Florida Statute Section 823.11 addresses removal of abandoned and derelict vessels from public waters. The statute makes it "unlawful for any person ... to store, leave, or abandon any derelict vessel as defined in this section in this state." Fla. Stat. § 823.11(2). The statute defines a "derelict vessel" as "any vessel, as defined in s. 327.02, that is left, stored, or abandoned ... [i]n a wrecked, junked, or substantially dismantled condition upon any public waters of this state." Fla. Stat. § 823.11(1)(a). Furthermore, the statute "authorize[s] and empower[s]" law enforcement officers, such as Officer Roque and Sergeant Gonzalez, "to remove

---

1266). Second, the Court previously found that the exhibits attached to the Complaint and the FAC establish that Hoefling did receive adequate notice. *See Hoefling*, 876 F.Supp.2d at 1330. Hoefling now attempts to pull the wool over the Court's eyes by disavowing those exhibits, declining to attach them to the SAC, and by arguing that they are not properly before the Court for consideration—a transparent attempt to overcome the Court's prior adverse finding. As mentioned in notes 2 and 6, *supra*, the Court *may* rely on those exhibits previously filed with the Court, and where, as here, "the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern.'" *Crenshaw*, 556 F.3d at 1292 (quoting *Griffin Indus.*, 496 F.3d at 1206). Finally, with respect to Plain-

tiff's conclusory allegation that Gonzalez and Roque were not acting within their discretionary authority, that determination is part of the qualified immunity analysis, which is a question of law for the court. *See, e.g., Maughon v. Bibb Cnty.*, 160 F.3d 658, 660 (11th Cir. 1998) (noting that "the issue of a government official's qualified immunity from suit presents a question of law") (citations omitted). And, the Court has already determined that Gonzalez and Roque *were* acting within their discretionary authority when performing the acts alleged in the Complaint. Accordingly, the Court reaffirms the conclusion in its previous Order Granting Defendants' Motion to Dismiss the FAC (D.E. 48) with respect to whether Defendants violated a clearly established constitutional right.

or cause to be removed any abandoned or derelict vessel from public waters in any instance when the same obstructs or threatens to obstruct navigation or in any way constitutes a danger to the environment." Fla. Stat. § 823.11(3)(a). Chapter 705 of the Florida Statutes provides procedures for the disposition of abandoned property by local governments when that property is found on public property. Pursuant to Florida Statute Section 705.103, when a law enforcement officer ascertains that an article of lost or abandoned property is present on public property and is of such nature that it can be easily removed, the officer shall take such article into custody and shall make a reasonable attempt to ascertain the rightful owner pursuant to the provisions of the statute. Fla. Stat. § 705.103(1). If the article of abandoned property present on public property cannot be easily removed, the statute directs the officer to place a notice on the article directing the owner to remove the article within five days; if the owner does not comply within the five days, the article will be removed and disposed of. Fla. Stat. § 705.103(2). Florida statutes define lost property and abandoned property as follows;

> "Lost property" means all tangible personal property which does not have an identifiable owner and which has been mislaid on public property, upon a public conveyance, on premises used at the time for business purposes, or in parks, places of amusement, public recreation areas, or other places open to the public in a substantially operable, functioning condition or which has an apparent intrinsic value to the rightful owner.
> "Abandoned property" means all tangible personal property that does not have an identifiable owner and that has been disposed on public property in a wrecked, inoperative, or partially dismantled condition or has no apparent intrinsic value to the rightful owner. *The term includes derelict vessels as defined in* s. 823.11(1).

Fla. Stat. § 705.101(2), (3) (emphasis added).

In the May 27, 2010 Incident Report, Officer Macias noted that Hoefling's sailboat "is derelict, in that it is left stored and abandoned in an substantially dismantled condition upon public state waters." (Am. Compl. Ex. 3 (May 27, 2010 Incident Report).) The Incident Report further stated that the "sailboat has no motor, sails, helm or rudder for propulsion or steering." (*Id.*) Officer Macias noted that on May 27, 2010, he contacted Hoefling, spoke with him "about the condition of his vessel," and "advised him that it needs to be removed or brought into compliance with the law as per Florida State Statute 823.11." (*Id.*) Finally, the Incident Report indicated that Hoefling told Officer Macias that "he was going to comply with the law as soon as he was able." (*Id.*) Furthermore, on May 27, 2010, Officer Macias left a notice on Hoefling's sailboat which stated that the vessel was unlawfully on the property. (Compl., D.E. 1, Ex. 3 (Notice).) Nearly three months after Hoefling received notice that his vessel was considered "derelict" and subject to removal pursuant to Florida Statute 823.11, on August 20, 2010 Officer Roque observed the vessel "covered with garbage." (Am. Compl. Ex. 3 (August 20, 2010 Incident Report).) After recovering a generator from the vessel because it may "possibly have value," *id.,* Officer Roque had the vessel "removed from state waters and destroyed by a city contractor." (Am. Compl. Ex. 3 (September 20, 2010 Incident Report).)

Accordingly, the facts of this case show that on May 27, 2010, Officer Macias provided proper notice to Hoefling pursuant to Florida Statute Section 705.103(2) because he left a City of Miami Office of Code Enforcement Notice on the vessel and he additionally spoke with Hoefling about the derelict condition of the vessel and told him that the vessel must be brought into compliance or removed under Florida Statute Section 823.11. The statute requires only that the owner of the derelict vessel be given five days['] notice to remove the vessel before the municipality removes and destroys the vessel. *See* Fla. Stat. § 705.103(2). Here, Hoefling was provided nearly three months to remove the vessel. Because he failed to do so, Officer Roque, ordered the vessel to be destroyed pursuant to Florida Statutes 823.11 and 705.103(2). Before ordering the vessel to be removed from public waters and destroyed, Officer Roque complied with Florida Statute 705.103(1), in that he boarded the vessel, removed a generator which he believed "possibly [had] value," and took the generator into custody under Hoefling's name.

*Hoefling,* 876 F.Supp.2d at 1329–30 (footnotes omitted).

■ Furthermore, Plaintiff makes no argument with respect to whether Defendants violated a "clearly established" right. As the Court previously found in its Order Granting Defendants' Motion to Dismiss the FAC:

Plaintiff has not met his burden of showing that Officer Roque and Sergeant Gonzalez are not entitled to qualified immunity because he has not shown that Defendants violated his "clearly established" rights.... Plaintiff's only ... ar-

gument is that the officers violated his "clearly established" rights because they failed to follow Florida Statute Section 823.11. However, the Court already found that Officer Roque and Sergeant Gonzalez complied with the procedures for derelict vessels and abandoned property as set forth in Florida Statute Sections 823.11 and 705.103. *See supra* Part III.A.1. Accordingly, because Plaintiff has failed to meet his burden of showing that the officers violated his "clearly established" rights, Officer Roque and Sergeant Gonzalez are entitled to qualified immunity on the non-constitutional maritime tort claims.

*Hoefling,* 876 F.Supp.2d at 1331. Accordingly, the Court concludes that Gonzalez and Roque are entitled to qualified immunity because (1) they were acting within their discretionary authority when performing the allegedly tortious actions, and (2) because Plaintiff has failed to meet his burden of showing that the officers violated his clearly established rights. *See Hoefling,* 876 F.Supp.2d at 1331.

In sum, Gonzalez and Roque are entitled to qualified immunity as to Counts I, II, III, and IV.[12]

**B. Constitutional Claims against City of Miami (Counts I and II)**

■ In Counts I and II, Hoefling attempts to allege two claims under 42 U.S.C. section 1983 against the City of Miami for (1) Fourteenth Amendment substantive and procedural due process violations (*id.* ¶¶ 41–47), and (2) Fourth and Fourteenth Amendment unreasonable search and seizure violations (*id.* ¶¶ 48–55). "The Supreme Court has placed strict limitations on municipal liability under

12. Gonzalez and Roque did not assert entitlement to qualified immunity with respect to

the Takings claim in Count V. That claim will be discussed in Section III(D), *infra.*

§ 1983." *Grech v. Clayton Cnty., Ga.,* 335 F.3d 1326, 1329 (11th Cir.2003).

A county's liability under § 1983 may not be based on the doctrine of respondeat superior. *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A county is "liable under section 1983 only for acts for which [the county] is actually responsible." *Marsh v. Butler County,* 268 F.3d 1014, 1027 (11th Cir.2001) *(en banc).* Indeed, a county is liable only when the county's "official policy" causes a constitutional violation. *Monell,* 436 U.S. at 694, 98 S.Ct. 2018. Thus, [Plaintiff] must "identify a municipal 'policy' or 'custom' that caused [his] injury." *Gold v. City of Miami,* 151 F.3d 1346, 1350 (11th Cir.1998) (quotation marks omitted) (alteration in original) (citing *Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)).

*Id.* Accordingly, Plaintiff "has two methods by which to establish a [city's] policy: identify either (1) an officially promulgated [city] policy or (2) an unofficial custom or practice of the [city] shown through the repeated acts of a final policymaker for the [city]." *Id.* (citations omitted). The second avenue—which Hoefling attempts to invoke here—is far more common because "a [city] rarely will have an officially-adopted policy of permitting a particular constitutional violation...." *Id.* "Under either avenue, a plaintiff (1) must show that the local governmental entity ... has authority and responsibility over the governmental function in issue and (2) must identify those officials who speak with final policymaking authority for that local governmental entity concerning the act alleged to have caused the particular constitutional violation in issue." *Id.* at 1330.

Counts I and II attempt to allege unofficial customs or practices of Constitutional violations against Defendants. With respect to the alleged Due Process violations, the SAC vaguely claims that, "[b]ased on information and belief, in connection with the investigation of potentially derelict and/or abandoned vessels, the defendant City and its police department's Marine Patrol Detail, as a matter of policy, custom, and/or practice, ignored plaintiff's fundamental rights...." (SAC ¶ 45.) With respect to the alleged search and seizure violations, the SAC vaguely claims that "based on information and belief, the City instituted and followed policies, customs, and/or practices that were a central and moving force behind the violation of plaintiff's right to be free from unreasonable searches and seizures." (*Id.* ¶ 54.) To begin with, this is precisely the sort of pleading "that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" that is insufficient to survive a 12(b)(6) Motion. *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955). And, if it is insufficient under this baseline 12(b)(6) standard, then, *a fortiori,* it is insufficient under the heightened pleading standard for section 1983 claims. *See Keating,* 598 F.3d at 762–63 (requiring "that a § 1983 plaintiff allege with some specificity the facts which make out its claim"). More fundamentally, Hoefling fails to plead the necessary elements of an unofficial policy claim because he wholly fails to identify, as is required, "those officials who speak with final policymaking authority for that local governmental entity concerning the act alleged to have caused the particular constitutional violation in issue." *Grech,* 335 F.3d at 1329. "Regardless of whether a plaintiff attempts to state a claim under section 1983 by alleging a policy or a custom, he or she must also identify an official who speaks

with 'final policymaking authority for [the municipality] concerning the act alleged to have caused the particular constitutional violation in issue.' " *Reyes v. City of Miami Beach*, No. 07–22680–CIV, 2008 WL 686958, at *12 (S.D.Fla. Mar. 13, 2008) (citing *Grech*, 335 F.3d at 1330.) "Indeed, 'municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.' " *Id.* (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)). For all these reasons, Counts I and II of the SAC against the City of Miami are dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### C. Maritime Tort Claims Against City of Miami (Counts III and IV)

 The SAC contains two tort counts against Defendants: (1) intentional destruction of property (SAC ¶¶ 56–59), and (2) negligent destruction of property (*id.* ¶¶ 60–63). A local government entity cannot assert sovereign immunity as a defense to an admiralty suit. *See Northern Ins. Co. of N.Y. v. Chatham Cnty., Ga.*, 547 U.S. 189, 196–97, 126 S.Ct. 1689, 164 L.Ed.2d 367 (2006). Local governments have been held liable for the maritime torts of their employees. *See Workman v. City of New York*, 179 U.S. 552, 573, 21 S.Ct. 212, 45 L.Ed. 314 (1900) (stating that "[a] recovery can be had *in personam* . . . for a maritime tort when the relation existing between the owner and the master and crew of the vessel, at the time of the negligent collision, was that of master and servant" and further finding that the City of New York could be held liable for its employees' negligence resulting in a collision of its fireboat with another vessel); *cf.*

*Cent. Rivers Towing, Inc. v. City of Beardstown*, 750 F.2d 565, 570 (7th Cir. 1984) (finding that the City of Beardstown was liable for damages to a vessel because "the City was negligent in failing to remove the pier remains after they became a hazard to navigation"); *Pelican Marine Carriers, Inc. v. City of Tampa*, 791 F.Supp. 845, 854 (M.D.Fla.1992) (finding the City of Tampa liable for damage to a vessel when that vessel hit a submerged sewer line because "[a]s the owner of the sewer line, the City had the duty to warn mariners of submerged hazards to navigation"). Accordingly, the Court turns to the merits of Plaintiff's tort claims.

 "General maritime law incorporates the general law of torts when not inconsistent with the law of admiralty." *Harrison v. Flota Mercante Grancolombiana, S.A.*, 577 F.2d 968, 977 (5th Cir.1978) (citations omitted). "The elements of maritime negligence are essentially the same as those for common law negligence." *Crayton v. Oceania Cruises, Inc.*, 600 F.Supp.2d 1271, 1275 (S.D.Fla.2009) (citing *Stuart Cay Marina v. M/V Special Delivery*, 510 F.Supp.2d 1063, 1071 (S.D.Fla. 2007)). "Generally, the elements necessary to prove a cause of action for negligence are: (1) a duty recognized by the law requiring a certain standard of conduct for the protection of others against unreasonable risks; (2) breach of the duty; (3) a reasonably close causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting to the interests of another." *Id.* (citation omitted); *see also Stuart Cay Marina*, 510 F.Supp.2d at 1070–71 (stating that "to make out a *prima facie* case of maritime negligence, a plaintiff must establish that the defendant owed a duty to the plaintiff under the law to conform to a particular standard of conduct in order to protect others against an unreasonable risk of

harm, that the defendant breached such duty, and that the breach harmed plaintiff in a manner that the duty of reasonable care seeks to prevent").

 The SAC alleges that "Defendants had a duty to plaintiff not to enter upon, seize, or destroy plaintiff's home and other belongings, in the absence of lawful authority to do so" (SAC ¶ 57, 61), and that they breached this duty, either intentionally or negligently, by "entering upon [his] home/vessel, seizing the vessel and its contents, and effecting the complete destruction thereof" (*id.* ¶¶ 58, 62). The City contends that general maritime law does not impose a duty of reasonable care upon law enforcement officers with respect to enforcement of the law. (Motion at 9–12.). In response, Plaintiff contends that the City's argument "is premised on the erroneous assertion that defendants were indisputably acting with lawful authority when they seized and destroyed plaintiff's home and other property." (Response at 17.) However, in the Court's Order Granting Defendants' Motion to Dismiss the FAC, the Court found that (1) the exhibits attached to the first two complaints filed in this case establish that Gonzalez and Roque *were* enforcing the law—*i.e.*, acting with lawful authority—when they took the actions alleged in the SAC, and (2) that maritime law does not impose a duty of care upon officers with respect to their enforcement of the law:

> Plaintiff overlooks the fact that he attached to his Amended Complaint three

City of Miami Police Department Incident Reports. In those Incident Reports, Officer Macias noted on May 27, 2010 that Hoefling's vessel "is derelict," and "advised [Hoefling] that it needs to be removed or brought into compliance with the law as per Florida State Statute 823.11." (Am. Compl. Ex. 3 (Incident Reports).) In the September 20, 2010 Incident Report, Officer Macias noted that "on Friday, August 20, 2010 Officer Ricardo Roque ... observed vessel to still be in its derelict condition and had it removed from state waters and destroyed by a city contractor." (*Id.*) Therefore, although Plaintiff's conclusory allegations in the Amended Complaint do not mention "enforcement of the law," the Incident Reports attached as exhibits to the Amended Complaint show that during all relevant periods, the officers were enforcing the provisions of Florida Statute Section 823.11. Plaintiff does not cite to any case—and the Court is unaware of any case—that states that under maritime law, police officers owe a duty of care to an individual member of the public with respect to the enforcement of the law.[13],[14] Accordingly, the Court finds that because Defendants did not owe a duty of care to Plaintiff with respect to the enforcement of the law, the tort claims must dismissed for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

---

13. Even under Florida law, which the Court may be able to apply in the absence of applicable maritime law, *see Steelmet, Inc. v. Caribe Towing Corp.*, 779 F.2d 1485, 1488 (11th Cir.1986), "there is no 'common law duty of care owed to an individual with respect to the discretionary judgmental power granted a police officer ... to enforce the law,'" *Albra v. City of Fort Lauderdale*, 232 Fed.Appx. 885, 888 (11th Cir.2007) (quoting *Everton v. Willard*, 468 So.2d 936, 938 (Fla.1985)); *cf. Tria-*

*non Park Condominium Ass'n v. City of Hialeah*, 468 So.2d 912 (Fla.1985) (explaining that governmental entities are immune when making the basic decision of how to enforce the laws).

14. Moreover, the Court notes that in his Response, Plaintiff does not cite to *any* case that sets forth the applicable duty of care.

876 F.Supp.2d at 1333–34. Neither the relevant law nor the facts of this case have changed since the Court issued its previous Order. *See id.* Thus, the Court once again finds that because Defendants did not owe a duty of care to Plaintiff with respect to the enforcement of the law, the tort claims must be dismissed for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Hoefling,* 876 F.Supp.2d at 1333–34.

### D. Takings Claim (Count V)

■ Finally, Plaintiff asserts that "Defendants have violated the Takings Clauses of the Constitutions of the United States and Florida in that they have taken plaintiff's property without public purpose and without just, full, and fair compensation." [15] (SAC ¶ 65.) In their Motion, Defendants argue that "[j]ust like municipal codes that require a property owner to make repairs to bring a home into compliance with [ ] building codes do not constitute either a physical taking or a regulatory taking, neither does the Florida Derelict Vessel Statute effect a taking to the extent it requires a vessel to be properly maintained or be removed from public waters." (Motion at 13 (citing *Serpentfoot v. Rome City Comm'n,* 322 Fed.Appx. 801, 805 (11th Cir.2009))). In his Response, Plaintiff contends that *Serpentfoot* is distinguishable because the plaintiff in that case "never alleged a physical deprivation of her property," but rather that a statute "requiring her to make repairs to her home constituted a *regulatory* taking." (Response at 18.) Plaintiff claims that he is not challenging the City's "*ability* to remove derelict vessels" or the con-

stitutionality of the statute, but rather that "unlawful and permanent seizure and destruction of his home and possessions constitute a physical taking under both Federal and State law." (*Id.*)

Once again, the flaw in Plaintiff's argument is that the seizure and destruction of Plaintiff's home and possession was *not* unlawful. As previously noted, "the Incident Reports attached as exhibits to the Amended Complaint show that during all relevant periods, the officers were enforcing the provisions of Florida Statute Section 823.11." *Hoefling,* 876 F.Supp.2d at 1334. Thus, the question becomes whether a viable Takings claims exists for the *lawful* seizure and destruction of Plaintiff's property. The Court must answer that question in the negative: "[I]t is settled that in the exercise of the police power a State 'may take, damage, or destroy private property without compensation, when the public necessity, the public health, or the public safety require it to be done.'" *Ashe v. City of Montgomery,* 754 F.Supp.2d 1311, 1315 (M.D.Ala.2010) (quoting *Hulen v. City of Corsicana,* 65 F.2d 969, 970 (5th Cir.1933)). [16]

In *City of Ft. Lauderdale v. Scott,* the City issued citations to several property owners for violations of the City Code. 888 F.Supp.2d 1279, 1284–1289 (S.D.Fla.2012). After the code violations went uncorrected, the City issued foreclosure, lien, and demolition notices to the various property owners. *Id.* Ultimately, the City filed foreclosure actions, and the property owners counterclaimed, arguing, *inter alia,* that "the City's acquisition of [the property owners'] properties through foreclosure

---

**15.** The Fifth Amendment to the U.S. Constitution provides, in pertinent part, that "private property [shall not] be taken for public use, without just compensation." The Florida Constitution provides, in pertinent part, that "[n]o private property shall be taken except for a public purpose and with full compensation therefor paid to each owner." Fla. Const. Art. 10, § 6.

**16.** *See* footnote 7, *supra.*

and other means constitutes an unlawful taking because the City was instead required to use eminent domain." *Id.* at 1290. The Court disagreed, noting that "the City never acquired ownership of any of Counter–Plaintiffs' properties." *Id.* at 1298. Moreover, "to the extent that the City took other actions regarding those properties, such as recording liens or demolishing structures, the record shows that those steps resulted from code violations that Counter–Plaintiffs did not timely correct. No evidence suggests that those actions involved an effort by the City to take the properties for public use." *Id.* (citing *Kelo v. City of New London*, 545 U.S. 469, 477–80, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005)). Accordingly, the Court granted the City summary judgment on the Takings claims. *Id.*

In *Ashe*, the City initiated abatement procedures and removed several vehicles and other items from the plaintiff's yard pursuant to a state law that provides " 'all cities and towns of this state shall have the power to prevent injury or annoyances from anything dangerous or offensive or unwholesome and to cause all nuisances to be abated and assess the cost of abating the same against the person creating or maintaining the same.' " *Id.* (citing Ala. Code § 11–47–117 (1975)). The Court found that because the City acted within the scope of its police power in accordance with city law for the abatement of a public nuisance, no viable takings claim existed. *Id.* Accordingly, the court granted summary judgment to the City of Montgomery on the Plaintiff's takings claim. *Id.; see also Johnson v. City of Prichard*, 771 F.Supp.2d 1310, 1319–20 (S.D.Ala.2011) (finding that the City's "exercise of police power, was clearly reasonable and within the limits of public necessity and the destruction of her property without compensation did not violate the Fifth Amendment Takings Clause").

In *State Plant Board v. Smith*, the Supreme Court of Florida addressed whether the statutorily-mandated destruction of citrus trees infested with (or possibly infested with) a citrus disease constituted a Taking under the state and federal constitutions. 110 So.2d 401, 404–05 (Fla.1959). In concluding that it was *not* a taking, the Court distinguished between a taking pursuant to a state's power of eminent domain and the destruction of property pursuant to its police power:

There is a very clear distinction between an appropriation of private property to a public use in the exercise of the power of eminent domain, and the regulation of the use of property—and its destruction, if necessary—in the exercise of the police power. 'Under the power of eminent domain the sovereign may make a compulsory purchase of the property of the citizen when such property is to be appropriated to a public purpose or use, but such compulsory purchase, or taking as it is called, cannot be made even by the sovereign 'without just compensation.'' *Moody v. Jacksonville, T. & K.W.R. Co.*, 1884, 20 Fla. 597, 606. Or, stated differently, in the exercise of the power of eminent domain the sovereign 'compels the dedication of the property, or some interest therein, to a public use, or, if already dedicated to one public use, then to another.' *State ex rel. Lamar v. Jacksonville Terminal Co.*, 1900, 41 Fla. 377, 27 So. 225, 237. *See also Adams v. Housing Authority of City of Daytona Beach*, Fla.1952, 60 So.2d 663.

On the other hand, the police power is exercised by the sovereign to promote the health, morals and safety of the community, *Adams v. Housing Authority, supra;* it rests 'upon the fundamental principle that every one shall so use his own as not to wrong or injure another.' *Mugler v. State of Kansas*, 123 U.S.

623, 661, 667, 8 S.Ct. 273, 300, 31 L.Ed. 205, quoted in *Pensacola & A.R. Co. v. State*, 1889, 25 Fla. 310, 5 So. 833, 3 L.R.A. 661. "To destroy property because it is a public nuisance is not to appropriate it to public use, but to prevent any use of it by the owner, and to put an end to its existence, because it could not be used consistently with the maxim, *sic utere tuo ut alienum non laedas.*" *Bowman v. Virginia State Entomologist*, 1920, 128 Va. 351, 105 S.E. 141, 145, 12 A.L.R. 1121, quoting 1 Lewis on Eminent Domain, 3d ed., § 247. *Id.* The court ultimately determined that the statute complied with the Florida Takings Provision as it provided for "just and fair" compensation for the destruction of the citrus trees. *Id.* at 406. However, in concluding its analysis on the issue, the court noted:

> When, in the exercise of the police power, the State through its agents destroys diseased cattle, unwholesome meats, decayed fruit or fish, infected clothing, obscene books or pictures, or buildings in the path of a conflagration, it is clear that the constitutional requirement of 'just compensation' does not compel the State to reimburse the owner whose property is destroyed. Such property is incapable of any lawful use, it is of no value, and it is a source of public danger.

*Id.* at 406–07; *see also Adams v. Hous. Auth. of City of Daytona Beach*, 60 So.2d 663, 666 (Fla.1952) (noting that "the police power is that power by which the Government may destroy or regulate the use of property in order to 'promote the health, morals and safety of the community', and the police power may be exercised without making compensation for the impairment of the use of property or any decrease in the value of property by reason of the regulated use") (citing *City of Miami Beach v. Ocean & Inland Co.*, 3 So.2d 364

(Fla.1941); *Blitch v. City of Ocala*, 142 Fla. 612, 195 So. 406 (1940); *Lott v. City of Orlando*, 142 Fla. 338, 196 So. 313 (1939); *Pasternack v. Bennett*, 138 Fla. 663, 190 So. 56 (1939); 29 C.J.S. *Eminent Domain* § 6; 18 Am.Jur. *Eminent Domain* § 11) (overruled in part on other grounds in *Baycol, Inc. v. Downtown Dev. Auth. of City of Ft. Lauderdale*, 315 So.2d 451 (Fla. 1975)).

These cases establish that when law enforcement officers destroy private property in the lawful exercise of the state's police power, there is no viable cause of action under the Takings Clauses of the Florida and U.S. Constitutions. Here, Defendants were acting within their lawful authority when they removed Plaintiff's vessel from public waters and had it destroyed. As explained above:

> In the May 27, 2010 Incident Report, Officer Macias noted that Hoefling's sailboat "is derelict, in that it is left stored and abandoned in an substantially dismantled condition upon public state waters." (Am. Compl. Ex. 3 (May 27, 2010 Incident Report).) The Incident Report further stated that the "sailboat has no motor, sails, helm or rudder for propulsion or steering." (*Id.*) Officer Macias noted that on May 27, 2010, he contacted Hoefling, spoke with him "about the condition of his vessel," and "advised him that it needs to be removed or brought into compliance with the law as per Florida State Statute 823.11." (*Id.*) Finally, the Incident Report indicated that Hoefling told Officer Macias that "he was going to comply with the law as soon as he was able." (*Id.*) Furthermore, on May 27, 2010, Officer Macias left a notice on Hoefling's sailboat which stated that the vessel was unlawfully on the property. (*See* Compl., D.E. 1, Ex. 3 (Notice).) Nearly three months after Hoefling received notice that his vessel was considered "der-

elict" and subject to removal pursuant to Florida Statute 823.11, on August 20, 2010 Officer Roque observed the vessel "covered with garbage." (Am. Compl. Ex. 3 (August 20, 2010 Incident Report).) After recovering a generator from the vessel because it may "possibly have value," *id.*, Officer Roque had the vessel "removed from state waters and destroyed by a city contractor." (Am. Compl. Ex. 3 (September 20, 2010 Incident Report).)

Accordingly, the facts of this case show that on May 27, 2010, Officer Macias provided proper notice to Hoefling pursuant to Florida Statute Section 705.103(2) because he left a City of Miami Office of Code Enforcement Notice on the vessel and he additionally spoke with Hoefling about the derelict condition of the vessel and told him that the vessel must be brought into compliance or removed under Florida Statute Section 823.11. The statute requires only that the owner of the derelict vessel be given five days['] notice to remove the vessel before the municipality removes and destroys the vessel. *See* Fla. Stat. § 705.103(2). Here, Hoefling was provided nearly three months to remove the vessel. Because he failed to do so, Officer Roque, ordered the vessel to be destroyed pursuant to Florida Statutes 823.11 and 705.103(2). Before ordering the vessel to be removed from public waters and destroyed, Officer Roque complied with Florida Statute 705.103(1), in that he boarded the vessel, removed a generator which he believed "possibly [had] value," and took the generator into custody under Hoefling's name.

*Hoefling*, 876 F.Supp.2d at 1330. Because Defendants were acting within their lawful authority and pursuant to the state's police power when it removed Plaintiff's vessel from public waters and had it destroyed,

Plaintiff has no viable takings claim. *See Hulen*, 65 F.2d at 970; *Ashe*, 754 F.Supp.2d at 1315; *Johnson*, 771 F.Supp.2d at 1319–20; *Scott*, 888 F.Supp.2d at 1298; *Smith*, 110 So.2d at 404–05, 406–07. Therefore, Count V of the SAC must be dismissed.

## IV. Conclusion

Accordingly, it is **ORDERED AND ADJUDGED** that:

(1) Defendants' Motion to Dismiss Second Amended Complaint and Motion to Strike Demand for Punitive Damages (D.E. 68), filed on April 25, 2013, is **GRANTED;**

(2) Plaintiff James Edward Hoefling, Jr.'s Second Amended Complaint (D.E. 65), filed on April 1, 2013, is **DISMISSED;**

(3) All pending motions are **DENIED AS MOOT;** and

(4) This case is now **CLOSED.**